19MAG822

ORIGINAL

Approved: Dina McLeod
DINA MCLEOD/ROBERT SOBELMAN
Assistant United States Attorneys

Before: HONORABLE ROBERT W. LEHRBURGER
United States Magistrate Judge
Southern District of New York

- - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | **SEALED COMPLAINT** |
| | : | |
| - v. - | : | Violations of |
| | : | 18 U.S.C. §§ 1344, 1349, |
| TERRANCE MORGAN, and | : | and 2 |
| ABRAHIM KAMARA, | : | |
| | : | COUNTY OF OFFENSE: |
| Defendants. | : | New York |

- - - - - - - - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

GREGORY HOLM, being duly sworn, deposes and says that he is a Special Agent with the U.S. Secret Service, and charges as follows:

**COUNT ONE**
**(Conspiracy to Commit Bank Fraud)**

1. From on or about January 5, 2019 up to and including in or about January 23, 2019, in the Southern District of New York and elsewhere, TERRANCE MORGAN and ABRAHIM KAMARA, the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit bank fraud, in violation of Title 18, United States Code, Section 1344, to wit, MORGAN who had unauthorized possession of account information for a bank account belonging to a law firm ("Account-1") attempted to take approximately $2.5 million from Account-1, which MORGAN and KAMARA then attempted to retrieve in cash at a hotel in New York, New York.

2. It was a part and object of the conspiracy that TERRANCE MORGAN and ABRAHIM KAMARA, the defendants, and others known and unknown, willfully and knowingly would and did execute a scheme and artifice to defraud a financial institution, the deposits of which were then insured by the Federal Deposit

Insurance Corporation, and to obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, such financial institution, by means of false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Section 1344.

(Title 18, United States Code, Section 1349.)

**COUNT TWO**
**(Bank Fraud)**

3. From on or about January 5, 2019 up to and including in or about January 23, 2019, in the Southern District of New York and elsewhere, TERRANCE MORGAN and ABRAHIM KAMARA, the defendants, and others known and unknown, willfully and knowingly did execute, and attempt to execute, a scheme and artifice to defraud a financial institution, the deposits of which were then insured by the Federal Deposit Insurance Corporation, and to obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, such financial institution, by means of false and fraudulent pretenses, representations and promises, to wit, MORGAN who had unauthorized possession of account information for a bank account belonging to a law firm ("Account-1") attempted to take approximately $2.5 million from Account-1, which MORGAN and KAMARA then attempted to retrieve in cash at a hotel in New York, New York.

(Title 18, United States Code, Section 1344 and 2.)

4. The bases for my knowledge and for the foregoing charges are, in part, as follows: I have been personally involved in the investigation of this matter. This affidavit is based upon my conversations with law enforcement agents, witnesses and others, as well as my examination of reports and records. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

**Background**

5. Since in or about January 2019, the U.S. Secret Service has been investigating TERRANCE MORGAN and ABRAHIM KAMARA, the defendants, in connection with a scheme to withdraw

funds without authorization from a law firm's bank account. As part of that investigation, and as set forth in greater detail below, an undercover agent with the U.S. Secret Service ("UC-1") made a series of recorded phone calls with MORGAN, in which the agent and MORGAN discuss their plan to take a large sum of money from the account, without authorization.

**Recorded Communications Regarding an Illicit Withdrawal of Funds from Account-1**

6. Based on my review of a consensually recorded phone call that took place on or about January 5, 2019, and my communications with UC-1, I have learned the following, in substance and in part[1]:

b. On or about January 5, 2019, UC-1, who was located in Manhattan at the time, placed a phone call to TERRANCE MORGAN, the defendant.

c. UC-1 used a service which made it appear that UC-1 was calling from a certain hotel in Manhattan ("Hotel-1"). UC-1 was not at Hotel-1, but was at another location in Manhattan.

d. At the beginning of the phone call, MORGAN identified himself as "Terrance." UC-1 told MORGAN, "I just landed in New York, just got to Manhattan, staying in a nice hotel actually."

e. UC-1 then told MORGAN that UC-1 worked as a contractor for a wire clearing house and had a good friend who worked at a certain bank ("Bank-1").

f. UC-1 then asked MORGAN whether he had an "actual account number" and "PIN," for a certain bank account, to which MORGAN responded in the affirmative. UC-1 suggested that if MORGAN was "looking to move a large amount," he should use several other bank accounts to which to transfer the money. MORGAN replied, "exactly," and stated that "I could try to get 3 different accounts. . . you know with like 3 different 'houses.'"[2]

---

[1] All statements from the recorded phone calls identified in this Complaint are set forth in substance and in part and on the basis of a preliminary transcription of those calls.

[2] Based on my training and experience, and my participation in this investigation, I believe that MORGAN uses the words "house" or "housing" to refer to a bank or bank account. For example,

g. UC-1 replied, "Okay, I hope you're not gonna use your name," to which MORGAN responded, "No no no no no no no. No these . . . are other people. Other people."

h. UC-1 then asked MORGAN, "do you know how much is in the account now?" MORGAN replied, "Yes, 3.9." UC-1 stated that he thought there was more, and MORGAN clarified that there had been "37" in the account, but that the amount had decreased. UC-1 stated that he had been prepared to "move a bigger number, but that's fine."

i. MORGAN then stated that he had the name of the account, the tax ID, the phone number, address, and ABA wire routing number for the bank account.

j. UC-1 stated that, if UC-1 were to help MORGAN move money out of the bank account, then UC-1 would take 10 percent of the proceeds, and UC-1's friend would take another 10 percent of the proceeds. MORGAN replied, "No problem," and told UC-1, "I don't have no problem with it at all understand because, like, I mean, because I have more business I could bring to you and this this is not the only one you know?"

k. MORGAN then provided the tax ID number, account number, and PIN number for a certain bank account to UC-1.

l. Based on my communications with representatives of Bank-1, I know that the information provided by MORGAN to UC-1 corresponds to an account, held at Bank-1, belonging to a large law firm ("Account-1").[3]

m. UC-1 then asked MORGAN, "how much are you looking to withdraw?" MORGAN responded, "as much as you can, man, if we could do 2 or, or 3, it don't matter." UC-1 replied "I would rather not empty it, because that would set flags." MORGAN replied, "Yeah ok, so let's do half then. 1.5?"

n. UC-1 then asked MORGAN, "do you trust the person you got the initial info from? . . . he's not gonna go point a finger, right?" MORGAN responded, "no, no, no . . . .

---

MORGAN stated later on in that phone call, "Do you have some housing, like some, like some banks . . . yourself?"

[3] Based on my training and experience, and my participation in this investigation, I know that Bank-1's deposits are insured by the Federal Deposit Insurance Corporation.

Trust me, trust me, trust me. This person is . . . overseas bro, they're not even here."

o. UC-1 asked MORGAN where the account information came from, and MORGAN replied, "It's more through a hack."

7. Based on my review of a consensually recorded phone call that took place on or about January 8, 2019, and my communications with UC-1, I have learned the following, in substance and in part:

a. On or about January 8, 2019, UC-1 called TERRANCE MORGAN, the defendant, from Manhattan—using a service which indicated that UC-1 was calling from Hotel-1—and told him that UC-1 was still in New York.

b. UC-1 told MORGAN that he had checked the balance of Account-1 and noticed it had gone up to $4.67 million the day before, and then down over a million dollars since then.[4]

c. MORGAN told UC-1 that he had obtained two bank accounts into which UC-1 could transfer money.

d. UC-1 told MORGAN that any transfer of money to accounts controlled by MORGAN would trigger a notification to a vice-president at Bank-1, and that therefore, the transfer would be "one time."

e. MORGAN asked UC-1 when he would be able to get the money in cash. UC-1 stated that UC-1's "buddy" could potentially withdraw the money in cash for an additional fee. MORGAN responded, "if you guys could do it and just up your percentage and . . . just give me cash, I'd be alright with that. That's what I want to do."

f. UC-1 explained to MORGAN that "if I clear you 1.5 million, that's a lot of cash, that's a lot of cash that has to go through the bank, cleared, written off, explained, you know, completely taken out, and then the record has to be you know, destroyed. You know? That's, that's not 1, 2, 3, either." MORGAN responded, "okay."

---

[4] Based on my training and experience and participation in this investigation, I know that Bank-1 allows a customer to check the balance on his or her bank account by calling in to an automated telephone line.

8. Based on my review of two consensually recorded phone calls that took place on or about January 15, 2019, and my communications with UC-1, I have learned the following, in substance and in part:

a. On or about January 15, 2019, UC-1 spoke to TERRANCE MORGAN, the defendant, by telephone, and told MORGAN that he was "trying very hard to keep the cash option open on the table." But in the event that that option did not work, UC-1 asked MORGAN for bank accounts to "I can immediately transfer what I have." MORGAN responded, "Okay."

b. MORGAN told UC-1 that he had "3 new homes" and "each one can hold up to 350." MORGAN told UC-1 that a friend owns the accounts and the most his friend wants placed "in there is 350."

c. MORGAN then provided UC-1 with information for three bank accounts, and told UC-1 he would try to get information for an additional two bank accounts.

d. UC-1 called MORGAN back later that same day and MORGAN provided UC-1 with two additional bank accounts.

9. Based on my review of two consensually recorded phone calls that took place on or about January 18, 2019, and my communications with UC-1, I have learned the following, in substance and in part:

a. On or about January 18, 2019, UC-1 spoke to TERRANCE MORGAN, the defendant, by telephone, and told MORGAN that UC-1 was able to withdraw funds from Account-1 in cash. UC-1 told MORGAN that the "cash route" was preferable because neither of them would have to "clean" a large amount of money.

b. UC-1 further told MORGAN that his "buddy" at Bank-1 would delay the posting of the transaction to the account for approximately 48 hours.

c. UC-1 told MORGAN that UC-1 would withdraw approximately 2 million dollars in cash on Tuesday, and that MORGAN would need to come to UC-1's hotel in New York City to take his share of the cash.

d. MORGAN agreed, and stated that he would book a flight to New York City for Wednesday morning.

10. Based on my review of two consensually recorded phone calls that took place on or about January 22, 2019, and my communications with UC-1, I have learned the following, in substance and in part:

a. On or about January 22, 2019, UC-1 spoke to TERRANCE MORGAN, the defendant, by telephone.

b. UC-1 told MORGAN that UC-1 would take out $2.5 million from the account. UC-1 further stated that UC-1 would take 10 percent, UC-1's "buddy" would take 10 percent, and two "runners" who were picking up the cash would take $75,000 each. UC-1 told MORGAN that his share would be $1.85 million.

c. MORGAN told UC-1 that he was bringing someone with him to pick up the money.

d. UC-1 asked MORGAN whether he was sure, and noted that there was a lot of money involved. MORGAN replied that he trusted the person he was bringing completely, and stated that he's "blood."

11. Based on my review of a consensually recorded phone call that took place on or about January 23, 2019, and my communications with UC-1, I have learned the following, in substance and in part:

a. At approximately 10:00 am, UC-1 called MORGAN, told him that UC-1 would meet MORGAN in the lobby of Hotel-1, and gave MORGAN a physical description of UC-1.

b. UC-1 told MORGAN to bring something large to put the cash into.

c. MORGAN told UC-1 what he would be wearing and gave UC-1 his own physical description.

**MORGAN and KAMARA's Meeting and Arrest at Hotel-1**

12. Based upon my participation in the arrest of TERRANCE MORGAN and ABRAHIM KAMARA, the defendants, my review of a recording of a conversation between MORGAN, KAMARA, and UC-1 on or about January 23, 2019, and my communications with UC-1, I have learned the following, in substance and in part:

a. On or about January 23, 2019, at approximately 10:30 a.m., UC-1 arrived at the lobby of Hotel-1 in New York, New York.

b. At approximately 10:40 a.m., two men wearing suits approached UC-1. One of them fit the physical description provided by MORGAN over the phone. MORGAN was carrying a medium-sized suitcase. The other man, later identified as ABRAHIM KAMARA, the defendant, was carrying a duffel bag that appeared to be completely empty.

c. MORGAN called UC-1 by the name UC-1 had provided to MORGAN. UC-1 confirmed that MORGAN was "Terrance."

d. UC-1 told MORGAN, while looking at KAMARA, in sum and substance, "There is a lot of money here. Is your brother aware of what's about to happen?" MORGAN said, "yes," and KAMARA nodded.

e. UC-1, MORGAN and KAMARA entered an elevator. UC-1 repeated that there were two boxes full of money upstairs, and played them a video of UC-1 emptying two boxes of cash onto a window sill. MORGAN and KAMARA watched the video.

f. MORGAN and KAMARA were arrested when they stepped out of the elevator.

WHEREFORE, deponent respectfully requests that the defendants be imprisoned or bailed, as the case may be.

GREGORY HOLM
Special Agent
U.S. Secret Service

Sworn to before me this
23rd day of January, 2019

THE HONORABLE ROBERT W. LEHRBURGER
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK